### SMITH v. COCKCROFT et al.

### SAME v. BURNS et al.

(Supreme Court, Appellate Division, Second Department. February 2, 1912.)

1. DOWER (§ 79*)—RIGHTS AND REMEDIES OF WIDOW—ACTIONS—EVIDENCE—SUFFICIENCY.

   In actions by a woman to recover dower in real estate held by defendants, claiming title through her deceased husband and from whom she claimed, where the determining issue was whether she and the deceased had been legally divorced more than 50 years before, evidence *held* in-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sufficient to sustain a finding that the affidavit of the serving officer, alleging that he personally served her in the divorce proceedings, was false.

[Ed. Note.—For other cases, see Dower, Dec. Dig. § 79.*]

2. WITNESSES (§ 159*)—COMPETENCY—TRANSACTIONS WITH PERSONS DECEASED.
    Code Civ. Proc. § 829, provides that a party to an action shall not testify in his own behalf against one who claims title under a deceased person concerning a personal transaction or communication between the witness and the deceased, except where the other party is examined or testimony of the deceased is given as to the same transaction. *Held*, in an action by a woman to recover dower in real estate held by defendants, claiming title through her deceased husband, that it was improper to permit her to testify that the reason she left home more than 50 years before was because of assaults and other ill usage by her husband, and in his presence by his father, where no opening was made by the adverse party for the introduction of such testimony.

    [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 666–669, 671–682; Dec. Dig. § 159.*]

3. APPEAL AND ERROR (§ 1048*)—PREJUDICIAL ERROR—WITNESSES—COMPETENCY—TRANSACTIONS WITH DECEASED PERSONS.
    The admission of such testimony was prejudicial to the defendants, where the verdict was for the plaintiff and was not fairly supported by the evidence.

    [Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 1048.*]

Appeals from Trial Term, Suffolk County.

Separate actions by Emily A. Smith against James Cockcroft and others and against Harry F. Burns and others. From a judgment for plaintiff, certain defendants in each action appeal. Reversed, and new trial granted.

Argued before HIRSCHBERG, BURR, THOMAS, WOODWARD, and RICH, JJ.

Rowland Miles, for appellants.

Frank F. Davis (Raymond D. Thurber, on the brief), for respondent.

WOODWARD, J.   These two cases involve the same issues, except as to the title of a certain piece of real estate; and this, in the view which we take of the questions involved, is not important here. The action is brought by one Emily A. Smith, as the widow of Epenetus Smith, deceased, for the purpose of recovering her dower interest in the real estate of which the said Epenetus died seised, and which is now held by the several defendants claiming title through him.   On the 11th day of November, 1851, Epenetus Smith, a widower, married Emily A. Pierson, the plaintiff in this action, and four children were born to them between that time and October, 1857.   At that time the plaintiff left the home in Crab Meadow, town of Huntington, and has since resided in and about the city of New York, supporting herself, as she testifies, by doing sewing, housekeeping, and latterly by the practice of palmistry.   She had two living children at the time she left home, one of them a girl 5 years of age and the other a boy of 2, and she testifies that she came back to see these children at intervals, until the girl had reached the age of 15 years, since which

time she has never visited the town of Huntington, or made any inquiries after her family, until the year 1910, when she appears to have sent for her son, who is still living, and to have returned with him to Huntington, where she resides with the son's daughter. For a period of 43 years, at least, the plaintiff in this action appears to have lived within 40 miles of the scene of her early married life, without once visiting the place, and without making any inquiries, or giving any intimation of her whereabouts, and for a space of 53 years she appears to have made no claims upon her husband for support; nor does she appear to have insisted upon her rights as a mother to see her children, though she testifies to having returned to the place three or four times during the first year, and several times subsequently, in the aggregate eight times, before she abandoned the effort to see them and retired from the scene. She testifies:

"I went away from that place in 1857. It was somewhere in October. My son Le Grand did not go with me; neither did my daughter Rebecca. After I went away in the fall of 1857, I was back four times that one year. On those occasions I did not see my children, Le Grand and Rebecca. The year following I came again, and the year after that I was there. I kept up my visits to this place where my children were until my girl was eight years old, before I ceased to go there. * * * I always used to carry them up something until twice, the last two times I was there, I didn't take anything, because they wouldn't let me leave them."

The last part of this answer was subsequently struck out; but it is quoted as tending to show that the plaintiff, although concededly the mother of these children, was not permitted to see them, or to leave presents for them—a most extraordinary thing, if she was entitled to the rights of motherhood. Continuing, she says:

"On the last occasion when I went to the house, I saw my daughter Rebecca. I also saw Le Grand at that time, but he didn't come near me. He stood down by the wagon house."

She says that she had some conversation with her daughter Rebecca on this occasion; that it was most unpleasant.

"After that I went away and stayed away. That was when she was 15 years old. She was born in 1852. It was somewhere in the 60's. And from that time, until last year, I haven't been back in the neighborhood of Crab Meadow."

On cross-examination she says:

"After I left Crab Meadow in 1857, I returned the following spring, 1858, just when the trees were budding out. I remember it all. I didn't remain any length of time at all. I went right back. I couldn't see my children."

The next time she came she testified that she didn't—

"remain any time. I went over to see them, and left. I remained overnight nowhere; sat in the woods until the boat got ready to go in the morning."

On the occasion of the third visit she testifies that she stayed upon the boat that night.

"The chambermaid said: 'Stay here; don't stay there, if they treat you mean.'"

It appears that this woman was not without motherly impulses. She came to see her children, bringing them presents; but she was not allowed to see them, or to leave presents. The only time she appears to have had any conversation with either of her children was when the daughter was 15 years old, or 10 years after the plaintiff had left Crab Meadow, and this interview was not a pleasant one. Certainly, if the plaintiff had not forfeited her rights as a mother, there was no reason why she should not have been permitted to see them—no reason why she should not have insisted upon seeing them. She appears to have been on a friendly footing with Epenetus Smith's own brother, and several other people in that locality, and, having the desire to see her children, she could have found a way. She could have insisted upon a mother's right to, and the fact that she did not seems to us to have a very important bearing upon this case, and one which has been largely overlooked.

[1] The defendants set up as a defense to these actions that— ·
"the said Epenetus Smith in his lifetime procured a judgment of absolute divorce within this state from his wife, Emily A. Smith, upon the ground of adultery, and that the said Epenetus Smith never married again."

The plaintiff replied to this defense, denying the allegation, and upon the trial the defendants offered in evidence the judgment roll in an action for divorce in the Supreme Court, between Epenetus Smith and Emily A. Smith, which judgment provided for the dissolution of the marriage, permitting the plaintiff, Epenetus Smith, to remarry, and forbidding the defendant, Emily A. Smith, to marry during the life of the said Epenetus Smith, and decreeing that—
"the plaintiff have the sole care and custody of Rebecca Smith and Le Grand Smith, the children of such marriage."

Here, it would seem, is a very good explanation of the reason why this plaintiff was not permitted to see her children. The court had given Epenetus Smith, the father, "sole care and custody" of these children, because of the wrongful conduct of the plaintiff, and when she was denied access to them she was compelled to acquiesce. Having no right to the "care and custody" of her children, she went for a time in the hope of seeing them, and when finally she had a conversation with her daughter at 15 years of age, which was not pleasant, she gave up the quest and went back to New York to live, remaining there for 43 years, with no effort to know more about any of them. In view of this condition, of this apparent acquiescence in what no virtuous mother would submit to without some show of resistance, what weight may be properly given to the plaintiff's unsupported statement that she was never served with process in this divorce action back in 1857?

This was the one vital issue in the litigation, and the verdict of the jury, sustaining the plaintiff's cause of action as the widow of Epenetus Smith, rests entirely upon the testimony of the plaintiff, after a silence of more than half a century, during which time her status as a divorced woman has been established by a judgment of the Supreme Court, that she was never served with the summons in that action.

The judgment of the Supreme Court, standing by itself, would be presumptive evidence of jurisdiction. 1 Freeman on Judgments, § 132. In the case at bar this presumption is made to affirmatively appear by the affidavit of George F. Steinbrenner—

"that on the 17th day of September last he served the annexed summons in the city of New York on the above-named Emily A. Smith, to him known to be the person mentioned and described in the summons as defendant therein, and that he left with the defendant such copy, as well as delivered it to her."

This affidavit was sworn to on the 10th day of October, 1857, and was, upon its face, sufficient to give the court jurisdiction of the person of the plaintiff, and the judgment entered in that action is, in so far as it establishes the status of the plaintiff and defendant in that action, a judgment in rem, and is "binding on the whole world." Freeman on Judgments, § 313, and authority cited in note; Hood v. Hood, 110 Mass. 463, 465, and authorities there cited. This judgment, supported by the presumption of jurisdiction, and by the affirmative evidence of service upon the plaintiff, "operative and conclusive as to all the world" (Hood v. Hood, supra), has stood without question for more than half a century, during which time the plaintiff, in harmony with the terms of the judgment, has been excluded from any participation in the care and custody of her children, during which time she has supported and cared for herself, without any demands upon her former husband, and during which time the defendants, with the right to rely upon this judgment, have been acquiring the property involved in this action, is now set aside upon the verdict of a jury, based upon the simple, unsupported statement of the plaintiff that she was not served with the summons in the action. The man who made the affidavit of service is dead, at least he could not be produced upon the trial, and the verdict of the jury in this case in effect convicts him of the crime of perjury upon the testimony of one who is vitally interested in the result of this action, and who is not supported by a single fact or circumstance to give force to her testimony.

In support of the presumption of jurisdiction, and the stronger presumption that George F. Steinbrenner, knowing the purpose of the action and that it was to come before the Supreme Court for adjudication, where the truth was likely to come out at any moment, did not deliberately commit perjury, is the conduct of the plaintiff during all these years, when everybody within the state of New York at least was bound to be governed by the adjudication in dealing with her or with her husband. Every fact and circumstance to which she testifies is what might be expected if the judgment had been known to her. She does not appear ever to have claimed any right to see her children. From all that appears she came to the place, approached the home across lots, and, on being refused access to the children, went away without making any protest or asserting any of the rights of motherhood, just as it was her duty to do under the decree of the court. No suggestion was made that the plaintiff had any claim upon the children or upon her former husband. He was not asked to do anything toward her support and maintenance, nor in any manner to

perform any of the obligations of a husband. It seems inconceivable that this judgment could have been in existence all of the years that the plaintiff was looking for an opportunity to see her children, and during which time it was binding upon every other person in the state of New York, in so far as it established her status, without its having come to her attention, and yet she testifies that she never heard of it until after this action was commenced, and the jury seem to have believed this statement, and to have in effect vacated the judgment in the divorce proceeding, to the injury of the defendants in this action, who must, in view of the judgment, be presumed to have acted in good faith in procuring their several interests in the property of Epenetus Smith. We cannot help thinking that the plaintiff has failed to produce that fair preponderance of evidence which entitles her to the verdict of the jury and the judgment which has been entered thereon.

[2] Sufficient justification might be found for reversal in the error of the court in permitting the plaintiff, on recall, over the objection and exception of the defendants on the ground that it was incompetent, immaterial, and irrelevant, and that it was not proper under the provisions of section 829 of the Code of Civil Procedure, to testify as to her alleged reasons for leaving the home of Epenetus Smith in 1857. The witness testified to the effect that Epenetus Smith's father, in the presence of her husband, habitually assaulted her with a bellows upon the head and body, and did other acts of cruelty, and that Epenetus Smith had himself cut her with a knife upon two occasions, and had otherwise ill-used her. This testimony was improper under the provisions of section 829 of the Code of Civil Procedure; no one having opened the door as to any transactions between the plaintiff in this action and Epenetus Smith. [3] But testimony which the public policy of the state excludes, as well as all irrelevant and immaterial testimony, to which objection is seasonably interposed, is presumptively prejudicial to the party objecting, and it is only where it is obvious that the testimony could not have affected the result that courts are justified in overlooking the error. Here, as we have already pointed out, the verdict of the jury rests upon a very small basis, not enough to fairly support the verdict; and it cannot be doubted that the recital of the alleged wrongs of the plaintiff when she was a mere child would have a tendency to appeal to the sympathies of a jury, and to produce a result which, however unjust to the defendants, would serve to compensate her for her sufferings. We think the error was not harmless; that it was fatal to a fair trial of the issues in this case.

The judgments and orders appealed from should be reversed, and a new trial granted; costs to abide the event. All concur.